Jones, Ghief Judge,
concurring in the result:
The real question in this case is whether the Securities and Exchange Commission, in using the end of the fiscal year as the date at which to calculate retention credits in connection with a necessary reduction in force, acted so unreasonably as to justify this court in finding that its action was arbitrary or capricious. Only if this question can be answered affirmatively would this court be justified in substituting its judgment for that of the agency. It seems doubtful whether the facts justify such judicial substitution of judgment in this case.
On May 12,1953, the Senate Committee on Appropriations recommended a substantial cut in the Independent Offices Appropriation Bill for the following fiscal year, and on May 20, 1953, the Senate passed the bill with the recommended reduction in funds. Because of this, it appeared to the Commission Chairman, and to the Director of Personnel, that a reduction in force would have to be made. The Director of Personnel was authorized to make the necessary preparations. The proposed reduction involved the separation of 50 of the 800 employees of the agency, 11 of whom *101 were in the division in which plaintiff was employed. The necessary plans were begun approximately 6 weeks before the end of the fiscal year.
It was only natural to expect that the appropriation bill would be passed before the beginning of the new fiscal year, thus it was equally natural for the Commission to plan to rate its employees for retention as of that date, July 1,1953. When the ratings were computed, it was found that there was a three-way tie between Hall, Olson, and Levinson, each of them having 10% years’ retention credit as of June 30, 1953. Civil Service Regulations provide that in the event of such a tie:
Half years of service will be used in breaking ties in retention standing, but any ties still remaining will be decided administratively. [CSC Regulations § 20.4(e).]
When, on July 31, 1953, the reduced appropriation bill finally passed both Houses of Congress and was approved by the President, notices were sent to the plaintiff that he would be separated, pursuant to the reduction-in-force regulations, effective August 31, 1953.
If the ratings had been calculated as of July 31 or as of August 31, 1953, plaintiff would have passed an anniversary date, acquiring an extra half-year credit, and Hall would have been separated in his place. He called this fact to the attention of the Personnel Director who ruled that the calculations had been made on a fiscal-year-end basis and that it was not practical to recalculate for each succeeding day, except for a tie, and then only for an added half-year or more. It is of note that this decision was affirmed upon appeal to the Civil Service Commission.
In passing on questions of this kind, we should not lose sight of the numerous and complicated problems arising in connection with the administration of a large nation-wide agency. Some of these agencies have many thousands of employees.
The Board of Appeals and Review of the Civil Service Commission, in its denial of plaintiff’s appeal, called attention precisely to this practical side of the matter when it discussed the fact that the one-year credit, and half-year *102 credit for tie breaking were developed for the purpose of solving such difficulties.
At the heart of the majority opinion lies the contention that the Commission was under the “clear mandate” of the Federal Personnel Manual, B3-12 (Jan. 12, 1951) to correct “any error of fact * * * in the register at the time the notice was issued.” The argument is made that the failure to correct plaintiff’s retention rating as of the date of his notice is such an error of fact. I do not agree with this interpretation, although I freely admit the issue is not free from doubt. That is not the nature of the error to which reference is made. The kind of error which was provided for by this portion of the Federal Personnel Manual was a manifest mistake as to the amount of service which plaintiff had performed. As to this, the parties were in • agreement. The disagreement here was not as to fact, but as to the manner in which the law is to be applied to the fact in order to determine the amount of retention points to be allowed. We should not apply it in such a manner as to deprive an agency of its “wide measure of discretion in the formulation of rules.” Hilton v. Forrestal, 165 F. 2d 251 (D.C. Cir., 1947).
We need not hold that another method, or even other methods might not have proven satisfactory and reasonable. That is not in issue here. The question is as to the method or system actually used, that is whether this court is justified in finding that the method used in computing retention credits was arbitrary, capricious or unreasonable.
It has been disclosed, however, that the department has adopted a new system that enables it by keeping a record as to the date of employment, to have a continuous record of the relative length of individual service, thus avoiding recalculation from day to day. If this system had been in effect plaintiff would not have been dismissed. There is no explanation as to why this simple method was not used theretofore.
While I do not agree with the reasoning of the majority, yet in view of the change in the system and the fact that it is now in effect, and considering the fact that the meaning of the regulations in effect at the time is not free from doubt, I am concurring in the result.
*103 FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Bichard Arens, and the briefs and argument of counsel, makes findings of fact, as follows:
1. Plaintiff, a veteran preference eligible, was employed by the Securities and Exchange Commission in the position of Attorney-Adviser (Finance), Grade GS-12, in the Division of Corporation Finance, from April 28, 1943, until August 31, 1953, when his employment was terminated in a reduction in force. During the foregoing period of plaintiff’s employment, his efficiency ratings were never less than satisfactory and at times were excellent.
2. Funds available for the operation of the Securities and Exchange Commission for the fiscal year 1954 (beginning July 1, 1953) were appropriated by the Independent Offices Appropriation Bill, 1954, H.B. 4663, 83rd Congress. This bill, when it passed the House of Bepresentatives on April 22, 1953, provided an appropriation for the Securities and Exchange Commission of $5,245,080, which was the same amount provided for the Commission for the fiscal year 1953. Shortly thereafter the subcommittee of the Senate Appropriations Committee which considered the bill recommended to the Senate Appropriations Committee an appropriation of $5,000,000 for the Securities and Exchange Commission, which was $245,080 less than the amount provided for the Commission in the bill as it passed the House.
3. The following are excerpts of minutes of a meeting of the Commission on May 8,1953:
Brief discussion was had concerning the action of the Subcommittee of the Senate Appropriations Committee in recommending reduced appropriations for the Commission in the amount of $5,000,000 for the fiscal year 1954, Chairman Cook reporting that he had an appointment with Senator Bridges, Chairman of the full Committee, to acquaint him with the facts with respect to the effect of such a reduction upon the Commission’s activities.
‡ $ $ $ $
The Budget and Fiscal Officer and Mr. Andresen of the Office of the General Counsel were present.
*104 The Commission approved a letter to be addressed by tlie Chairman to Senator Styles. Bridges, Chairman of the Committee on Appropriations, United States Senate, with respect to the Commission’s appropriation for the fiscal year 1954. The letter referred to advice which the Commission had received that the Subcommittee considering the Independent Offices Appropriation Bill for 1954 was recommending to the Appropriations Committee of the Senate an appropriation of $5,000,000 for the Commission, which was $245,080 less than the amount provided in the billpassed by the House and also was $245,080 below the Commission’s appropriation for the current fiscal year. The letter urged that the full Committee recommend an appropriation for the Commission at least in the amount provided in the House Bill.
4. A letter, dated May 8, 1953, from the then Chairman of the Commission to the then Chairman of the Senate Committee on Appropriations reads in pertinent part as follows:
I understand that the Subcommittee considering the Independent Offices Appropriation Bill for 1954 is recommending to the Appropriations Committee of the Senate an appropriation of $5,000,000 for the Securities and Exchange Commission, which is $245,080 less than the amount provided in. the bill passed by the House and also is $245,080 below the Commission’s appropriation for the current fiscal year.
I am sending this letter to you to urge that the full Committee recommend an appropriation for the Commission at least in the amount provided in the House bil]. I have been informed that the Subcommittee’s report will indicate that the Commission would be able to operate satisfactorily in 1954 with less money than provided in the House bill and no mention is made as to where the reduction is to be applied. Surely there has been a misunderstanding of our present situation. Probably we did not make clear the results of the cuts that have already been imposed in prior years and the current high level of financial activity.
Following the adoption of the last of the series of statutes that the Commission is responsible for administering and prior to the beginning of the war, the Commission’s staff exceeded 1700 employees, which was what was then thought appropriate for the administration of *105 those statutes. The proposed appropriation cut, together with those that have gone before, would result in the abolition of almost 1000 of those 1700-and-some-odd positions. This is shown in more detail in the enclosed chart. The elimination of a thousand positions in one of the large departments might have no significant effect on its operations, but it is drastic indeed when it is subtracted from a basic compliment of 1723 employees.
This drastic reduction does not reflect an adjustment to a declining work-load — or even to a stable one. On the contrary, the general level of activity in the main areas over which we have jurisdiction has more than doubled while our staff was in the process of being cut to less than half. This is shown by the attached table setting forth various indices of activity in the primary and secondary capital markets.
* * * * *
* * * As you know, the appropriation recommended for us is materially lower than that passed by the House and materially lower than the amount on which we are currently operating. In addition to requiring us not to fill any vacancies at all during the coming year, it would require us again to reduce our staff by firing employees, something that appropriation limitations have already required us to do four times in the past four years.
‡ ‡ ‡ ^ if;
We are certain that the situation of these other agencies is not more crucial than ours, and we respectfully request the Committee to give this matter its careful consideration and to restore the recommended appropriation to at least the figure approved by the House.
5. On May 12, 1953, the Senate Committee on Appropriations reported the Independent Offices Appropriation Bill to the Senate with the reduced appropriation for the Commission as recommended by the subcommittee; and on May 20, 1953, the bill passed the Senate with the reduced appropriation for the Commission as reported by the Committee.
6. During the progress of the Independent Offices Appropriation Bill through the Senate, the Commission Chairman received a report and an analysis from the Commission Budget and Fiscal Officer of the effect of the proposed cut in the Commission appropriation, and the Commission Chair *106 man was in almost daily consultation with the Commission Director of Personnel respecting the possible effect of the proposed cut. When the Senate passed the Independent Offices Appropriation Bill with the reduced appropriation on May 20, 1953, it appeared to the Commission Chairman and to the Director of Personnel that a reduction in force would have to be made, and the Director of Personnel was authorized by the Commission Chairman to prepare for a reduction in force.
,7. A letter, dated June 3, 1953, from the then Chairman of the Commission to the then Chairman of the Subcommittee on Independent Offices of the Senate Committee on Appropriations reads in pertinent part as follows:
Believing, from our prior correspondence on and discussion of this subject, that you understand our urgent need for the 50 people who would have to be eliminated if the reduction of $245,080 stands, I again respectfully request that the Conferees on this bill give favorable consideration to restoring the appropriation to the amount approved by the House of $5,245,080.
8. A letter, dated July 13, 1953, from the then Chairman of the Commission to the then Chairman of the Subcommittee on Independent Offices of the Senate Committee on Appropriations reads in pertinent part as follows:
The reduction in force which would be made necessary by the lower appropriation would be approximately 50 people. A substantial number of these would come from the Division of Corporation Finance, from the Trading and Exchange Division, and from the regional offices.
* * # * *
In view of all these circumstances, therefore, I respectfully submit that if the Conferees approve the House figure, the Commission will do a better job of self-improvement as well as a better job of law enforcement.
0. On July 29, 1953, a second conference report on the Independent Offices Appropriation Bill was agreed to by both the House and Senate with the reduction in the appropriation to the Commission as contained in the bill as it had *107 passed the Senate. On July 31,1953, the bill was approved by the President.[1]
JO. The reduction in force in which plaintiff’s employment with the Commission was terminated was carried out under the direction of the Commission Director of Personnel, William E. Becker, whose duties included, among others, the maintenance of personnel records. Becker had participated in four prior reductions in force.
Jl. On May 20,1953 (the date on which the Senate passed the Independent Offices Appropriation Bill with the reduced appropriation and the date on which the Commission Chairman authorized Becker to prepare for a reduction in force) Becker directed his staff, consisting of six persons, to make ready for a reduction in force. The proposed reduction in force involved the separation of 50 persons of whom 11 were in the Division of Corporation Finance in which plaintiff was employed. Becker directed his staff to compute the retention registers as of June 30,1953, because:
First of all it was the end of the fiscal year. Second, the date was approximately six weeks hence and I estimated that by June 30 we would have an appropriation bill enacted and we would know one way or the other whether a reduction in fact was necessary.
12. Service record cards containing several items of information on each of the then approximately 800 employees of *108 tbe Commission were maintained by Becker on a current basis. These cards were letter size and were arranged by division, by office, by subordinate organization, and by grade. Included in the information was each employee’s service computation date which determines the number of his service credits and accordingly his retention rights within his competitive level.
13. In preparing for the reduction in force, Becker and/or his staff:
(a) transcribed information from the service record cards to reduction in force cards. This operation took “several days.”
(b) computed the retention credits.
(c) charted “bumping” and “retreat” rights of approximately 150 employees who had such rights.
(d) defined an estimated 70 to 80 competitive levels.
(e) arranged the reduction in force cards in accordance with competitive levels. The cards were arranged to the nearest full year, but were not arranged within a full year.
(f) prepared retention registers (one for each competitive level) computed as of June 30,1953.
(g) prepared undated notices of reduction in force.
14. The foregoing preparation for the reduction in force was completed by June 20, 1953, by which date the decision as to the individual employees who wmuld be separated during the reduction in force, if a reduction in force became necessary, had been made.
15. On July 31,1953 (the date on which the President approved the Independent Offices Appropriation Bill) the Commission Chairman orally authorized Becker to proceed with the issuance of the notices of reduction in force, and the notices were issued on that date. A letter, dated July 31, 1953, addressed to plaintiff from Becker reads as follows:
A reduction in funds for the fiscal year 1954 makes it necessary for the Securities and Exchange Commission to separate members of the staff in its Headquarters Office in Washington, D.C.
Your present position is Attorney-Adviser (Finance), GS-12, $8040 per annum, Division of Corporation Finance.
*109 You are a veteran, serving under permanent appointment, without competitive Civil Service status, in an excepted position. Your retention subgroup is I-A.
It bas been determined that it will be necessary to eliminate positions in your competitive level. As a result of reduction in force conducted in positions comparable to yours, your service for the Securities and Exchange Commission must be terminated at the close of business on Aug. 31,1953.
Since you do not have competitive civil service status, you are not entitled to any reassignment rights.
The Civil Service Commission’s regulations for reduction in force are available for your inspection in the Library, Koom 184, and in the Branch of Personnel, Koom 117.
You may inspect retention Registers for your grade in the Branch of Personnel, Koom 117. If after examining the regulations and registers, you feel that there has been a violation of your rights under the regulations, you have the right to appeal in writing to the Central Office of the Civil Service Commission in Washington, D.C. Any appeal must be made within 10 days of your receipt of this letter and must include your specific reasons for appealing.
I will be available to discuss this matter with you and to give you information regarding your final salary check, lump-sum leave payment and retirement benefits or refund.
Mr. Harry Pollack, Assistant Director of Personnel, will give you all available information concerning employment in private industry and in other Federal agencies.
The Securities and Exchange Commission appreciates the service you have rendered and regrets that circumstances require this reduction in force.
16. At all pertinent times there were in the employ of the Commission two other employees, namely Robert Olson and Charles Hall, who were in the same subgroup and competitive level as the plaintiff. Plaintiff, Olson, and Hall were all veteran-preference eligibles but did not have “bumping” or “retreat” rights, nor did they enjoy competitive status.
17. The retention register on which plaintiff’s name, Herman D. Levinson, appears was as follows:
*110 Retention Register
Competitive Area: Headquarters Office
Competitive Level: Attorney, Excepted Position, GS-12 (Division of Corporation Finance)
Sub- Retention group Name Title Credits
X-A Hall, Charles T. Attorney-Adviser 10%
Olson, Robert E. Attorney-Adviser 10%
Levinson, Herman D. Attorney-Adviser 10% Separated
The above retention register thus reflected a three-way tie in retention credits as of June 30, 1953, and the reduction in force requirements were for one of the three to be separated. The decision to separate plaintiff was made by the Director of the Division of Corporation Finance who told Becker of his decision toward the end of the preparation period.
18. As of June 30,1953 (the date as of which the retention registers were computed) the total creditable federal service for plaintiff-Levinson, Olson and Hall was respectively as follows:
Levinson — 10 years, 11 months, 19 days
Olson — 10 years, 11 months, 2 days
Hall — 10 years, 7 months, 12 days
19. On July 11, 1953, plaintiff had completed a full 11 years of creditable service which included other federal service in addition to his service with the Commission. If the retention register on which plaintiff’s name appeared had been computed as of July 11, 1953, plaintiff would have had 11 retention credits.
20. As of July 31, 1953 (the date on which the notices of reduction in force were issued) the total creditable federal service for plaintiff-Levinson, Olson and Hall was respectively as follows:
Levinson — 11 years, no months, 19 days
Olson — 11 years, no months, 2 days
Hall — 10 years, 8 months, 12 days
21. As of August 31, 1953 (the date on which plaintiff’s employment was terminated) the total creditable federal service for plaintiff-Levinson, Olson and Hall was respectively as follows:
*111 Levinson — 11 years, 1 month, 19 days
Olson — 11 years, 1 month, 2 days
Hall — 10 years, 9 months, 12 days
22. Had a computation date of either July 31, 1953, or August 31, 1953, been used in the preparation of the retention register on which, plaintiff’s name appeared, plaintiff and Olson would have had 11 retention credits each and Hall would have had only 10 retention credits, and plaintiff’s employment would not have been terminated in the reduction in force.
23. Shortly after receipt of the letter dated July 31, 1953 (set forth in paragraph 15, supra) advising him that his service for the Commission must be terminated at the close of business on August 31, 1953, plaintiff told Becker that he was entitled to have his service “brought up to date” before being dismissed from the Government. Thereafter, plaintiff timely prosecuted his claim and exhausted the administrative remedies available to him.
24. A letter, dated August 5, 1953, addressed to the Reduction in Force Section of the Civil Service Commission from plaintiff reads in part as follows:
I hereby appeal from the action of the Securities and Exchange Commission (SEC) which has served me with a notice of separation, dated July 31, 1953, effective August 31, 1953.
The grounds of my appeal include violation of the rights guaranteed me under the Veterans Preference Act of 1944, as amended, and any and all other pertinent statutes, executive orders, directives, rules and regulations under, by or through which such rights are established, granted or derived, including but in no wise limited to: (a) improper and incorrect computation of my retention credits and (b) illegal and improper establishment of the Retention Register on which the above-mentioned notice of separation is based.
‡ ‡ $
A Retention Register was established by the SEC, as of June 30, 1953, upon which I am credited with 10% retention credits. Your attention is respectfully directed to Section R3-12 “Order on Register” of the Federal Personnel Manual which requires agencies to adjust retention credits to the date of the separation notice. On that basis I would be entitled to 11 reten *112 tion credits. Two others in my competitive area are also credited with 10% retention points, but neither of these has been served with a separation notice.
It is therefore respectfully requested that the Retention Register above-mentioned be corrected in accordance with existing law, and that appropriate correction be made in my retention credits, and that the separation notice served on me be rescinded.
25. A letter, dated August 18, 1953, addressed to plaintiff from the Head of the Reduction in Force Unit of the Civil Service Commission reads in part as follows:
Although Mr. Olson and Mr. Hall, the other two employees listed in your competitive level, have accumulated creditable service which is slightly at variance with yours, there was actually less than six months of difference among the three of you at the time the retention register was established on June of this year and it was therefore discretionary with your agency under the Retention Preference Regulations as to how this tie should be broken. The Regulations do not require that the retention credits of employees must be constantly recomputed as individual anniversary dates are reached after a retention register has once been established for a reduction in force. The register which was established in your case as of June 30 is considered to have been reasonably current for the reduction in force which began on July 31 when your notice was issued.
26. A letter, dated August 26,1953, addressed to the Chairman of the Civil Service Commission Board of Appeals and Review from plaintiff reads in part as follows:
I hereby appeal to the Civil Service Commission Board of Appeals and Review from the decision of the Reduction in Force Unit that there is no basis upon which my appeal from the reduction in force action of the Securities and Exchange Commission in my case can be sustained.
* $ * $ *
I except to the decision for the following reasons, but not limited thereto:
(1) That the Civil Service Commission’s Regulations concerning the establishment of a Retention Register are illegal in that they are vague and indefinite.
(2) That the Regulations fail to define the word “current” in connection with Retention Registers.
*113 (3) That the Regulations fail to give consideration to the date of notice and the date of separation in connection with such Registers.
(4) That nothing in the Regulations provides that the Retention Registers shall not be corrected to reflect the facts as of the date of notice or separation.
(5) That my retention credits should have been computed to the date of notice or to the date of separation.
(6) That, on the facts, I am entitled to eleven retention credits and consequently my separation notice is erroneous.
Attention is also called to the Commission’s own directions to government agencies with respect to the establishment of registers for reduction in force, as contained in its Personnel Manual, which require that the register be adjusted to reflect, among other things, “the service credited ... in the register at the time the notice [of severance] was issued.”
27. A letter, dated December 8, 1953, addressed to plaintiff from the Chariman of the Board of Appeals and Review of the Civil Service Commission reads in part as follows:
You were one of three competing employees serving under excepted appointments without time limitations, all entitled to veteran preference, and all with approximately equal length of service. Your service computation date was July 12, .1942, and the others had service computation dates of July 29, 1942, and November 12, 1942, respectively. The reduction in force was required by a drastic cut in appropriations for the new fiscal year which began July 1, 1953, and retention registers were accordingly established as of June 30, 1953, which showed these three employees tied with ten retention points each. The tie still remained when extra half years of service were counted. Only two of these three could be retained and the agency exercised its permissible administrative choice to retain the other two employees and notify you of proposed separation in the reduction in force. The new appropriation was not approved prior to July 1, 1953, however, and the distribution of notices were deferred from day to day until July 31, 1953, when it became certain that the reduction in force could not be avoided. You contend that the agency should have been required to revise its retention registers to reflect your additional month of service before it sent you your notice in the reduction in force. Such precise alteration of service records would have *114 deprived, the agency of its administrative choice in your case between July 12, 1958 and November 12, 1958.
Section 12 of the Veterans Preference Act requires the Civil Service Commission to “give due effect” to length of service in regulations governing reductions in force. The Commission applies this directive by giving one retention point for each full year of service, and by requiring that ties be broken, wherever possible, by extra half years of service. It is also required that the service of all competing employees shall be brought current as of the same date in planning a reduction in force. These regulations were properly applied by your agency in the reduction in force on which your appeal was based. The Board does not believe that the delay of a month in issuing your notice made it necessary to revise all service records of employees competing for retention in the reduction in force. The retention register established as of June 30, 1953, is not considered to have ceased to be “current” on July 31, 1953.
Since there is no error in the prior decision in your case, it is affirmed and your appeal is denied.
28. Civil Service Regulations 20.3, 20.4(d), 20.4(e), and 20.9, 5 C.F.B,. (1949 Supp.), in effect at all material times, read as follows:
20.3 Compilation of employee records, (a) Each agency is responsible for maintaining current records of information necessary to determining relative retention preference of employees.
(b) If such records are incomplete, they may be supplemented by written statements from employees, each supported by a signed certificate that the information it contains is true, correct and complete according to the employee’s knowledge and belief.
$ $ $ $ $
20.4(d) Retention register — (1) Compilation. When two or more competing employees are in a competitive level which is to be affected by a reduction in force, the retention records of such employees shall be brought up to date on a current basis, and a retention register shall be compiled. All employees in positions in the particular competitive level, whether in duty, leave, or furlough status, excluding only those absent in the armed forces of the United States with reemployment rights, shall be entered on the register in the order of retention groups and subgroups, and according to retention credits in any subgroup when there are two or more. One re *115 tention credit shall be given for each full year of Federal Government service, and four retention credits shall be given for an “Outstanding” performance rating. _ If there are any temporary employees assigned to positions in the competitive level, their names and the expiration dates of their appointments shall be entered below the space provided for employees in retention groups on the register. Likewise, if there are any employees serving in positions in the competitive level under any kind of appointments, with current official performance ratings of “Unsatisfactory”, their names shall be entered on the register below the names of temporary appointees.
(2) Separation of registers. Separate registers shall be compiled to show the distinctions between competitive levels representing positions in the competitive service; excepted from the competitive service; and those filled on a seasonal, when-actually-employed (WAE), or part-time basis.
(3) Availability for inspection. Employees notified of proposed adverse action in a reduction in force shall have an opportunity to examine retention registers and other records which have a bearing on the actions in their cases. All registers and records shall be open for inspection by representatives of the Civil Service Commission.
(e) Sequence of selection. With respect to each competitive level, action must be taken to remove all employees with official “Unsatisfactory” performance ratings, and all temporary employees, from positions affected by a reduction in force before any competing employee, in any retention group, is reached for action. Thereafter, selections for action must be made in order from the bottom to the top of the register. Half years of service will be used in breaking ties in retention standing, but any ties still remaining will be decided administratively.
$ ‡ ‡
20.9 Appeals, (a) Any employee notified of proposed action in a reduction in force who believes that the regulations in this part have not been correctly applied may appeal to the appropriate office of the Civil Service Commission, stating reasons for believing the proposed' action to be improper, within ten days from the date he received notice of the proposed action (or supplementary notice specifying different adverse action), or within ten days after a decision by the agency on his answer to any notice giving him an opportunity to answer.
*116 (b) Further appeals: An appeal may be made by the employee or the employing agency from the initial decision within the Commission, to the Commissioners, United States Civil Service Commission, Washington 25, D.C., within seven days of the date of receipt of notification of the initial decision.
(c) Finality of Commission recommendation: The agency is required to take corrective action without delay conforming to the Commission’s recommendation, but action to comply with an initial decision may be stayed when a further appeal to the Commissioners is made in accordance with paragraph (b) of this section, until such time as the Commission’s decision on the further appeal is made.
29. A provision of the Federal Personnel Manual, E3-12, dated January 12, 1951, issued by the Civil Service Commission under the heading “Order on Register,” in effect at all material times, reads as follows:
The order of standing on a retention register on the date of the issuance of an employee’s notice of action by reduction in force is controlling as to the rights of the employee throughout the period specified in the notice, except that the retention register and actions taken on the basis thereof shall be adjusted to reflect:
(1) The correction of any error of fact (such as the service credited, or the performance rating) in the register at the time the notice was issued * * *.
(2) Changes in competitive status or veteran preference which occur before the employee is separated from the rolls of the agency.
30. At the trial Becker testified that after the preparations for the reduction in force had been completed (by June 20, 1953) corrections of clerical errors could have been made in a single retention register without affecting other retention registers, but that a change in the computation date on the retention register on which plaintiff’s name appeared would have required the following procedure:
(a) changing the reduction in force cards for virtually every employee in the Commission;
(b) recharting “bumping” and “retreat” rights of approximately 750 employees who had such rights ;
(c) recomputing all of the 70 to 80 retention registers; and
*117 (d) preparing new notices of reduction in force.
Becker estimated that the foregoing procedure would have required “the energies of three people a couple of weeks.”
31. Beginning upon the termination of his employment with the Commission on August 31, 1953, and continuing until August 1, 1954, plaintiff diligently sought to obtain employment both with the Government and with nongovernmental employers, not only in occupations in which he could utilize his legal training but also in other and more modest callings. Plaintiff’s first gainful employment after August 31,1953, commenced on August 2,1954, as Attorney-Adviser at the Subversive Activities Control Board at the same salary rate he had formerly received at the Commission. At the time plaintiff’s employment was terminated with the Commission, he held the position of Attorney-Adviser (Finance), Grade GS-12, in the Division of Corporation Finance, at the rate of $8,040 per annum.
32. The trial of the case was limited to the issues of law and fact relating to the right of plaintiff to recover, reserving the determination of the amount of recovery, if any, for further proceedings.
summaRT
33. On May 20, 1953, the Securities and Exchange Commission began and on June 20,1953, completed preparations for a reduction in force which appeared to be imminently necessary because of the probabilities that the appropriation for the Commission would be reduced. The retention registers were computed as of June 30, 1953, because it was the end of the fiscal year, and because it was estimated that by that date the appropriation bill for the ensuing fiscal year would be enacted.
34. The retention registers, computed as of June 30, 1953, revealed that on that date plaintiff and two other employees were tied in retention credits; and since the requirements of the proposed reduction in force were for one of them to be separated, the decision was made by the appropriate official that the plaintiff would be separated if the reduction in force became necessary.
35. The appropriation bill was approved on July 31,1953, on which date the notice of reduction in force was issued to *118 plaintiff pursuant to which his employment was terminated, on August 31,1953.
36. If the retention registers had been computed as of either July 31,1953, or August 31, 1953, plaintiff’s employment would not have been terminated in the reduction in force.
CONCLUSION OK LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to recover, and judgment is entered to that effect with the amount of recovery to be determined pursuant to Buie 38 (c).
On June 18, 1963, the parties filed a stipulation wherein defendant consented to the addition of Elizabeth L. Bilanow and Henry Walter Levinson as parties and plaintiffs herein, in addition to Elizabeth L. Bilanow, Administratrix of the estate of Herman David Levinson. In accordance with the opinion of the court, and on a memorandum report of the commissioner and the written stipulation of the parties, it was ordered by the court on June 21, 1963, that Elizabeth L. Bilanow and Henry Walter Levinson be added as parties plaintiff in this case and that judgment be entered for plaintiffs Elizabeth L. Bilanow and Henry Walter Levinson for $6,869.38. It was further ordered that the petition as to the plaintiff Elizabeth L. Bilanow, Administratrix of the estate of Herman David Levinson, be dismissed.

 The following joint exhibit sketches the chronology of the Independent Offices Appropriation BUI, 1954, H.R. 466,3:
Hearing available_ 4/21/53
Reported without amend., H. Report 276__ — --4/1.7/53
Amended on House Floor_,---4/22/53
Recommittal motion rejected (roll-call vote)_4/22/53
Passed House with amend, (voice-vote)___4/22/53
To Senate Committee on Appropriations_4/23/53
Hearing___■_4/21/53
Hearing available_,-5/13/53
Reported, with amend., S. Report 237_5/12/53
Amended on Senate Floor_5/15/53
Amendts. on S. Floor rejected (roll-call votes)-5/18/53
Amended on S. Floor_,---,-5/18/53
Arndt, on S. Floor rejected (roll-call vote)_5/20/53
Amended on S. Floor (roll-call votes)-5/20/53
Passed S. with amend- 5/20/53
S. appoints conferees_5/20/53
H. appoints conferees_7/14/53
Conf. Rept. submitted to H., H. Report 881- 7/20/53
Conf. Rept. agreed to by House-7/21/53
Conf. Rept. submitted to and disagreed to by Senate-7/24/53
H. reappoints conferees_7/27/53
S. reappoints conferees_7/27/53
Conf. Rept. submitted to H., H. Report 997- 7/27/53
Conf. Rept. submitted to S_7/28/53
Conf. Rept. agreed to by House- 7/28/53
Conf. Rept. agreed to by S___7/28/53
To President- 7/29/53
Approved (Public Law 176)_7/31/53